UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
RICHARD O. KLING, M.D., BRENDA
SUTTON, SHIRLEY MORTON, KENYA
TUCKER, HAROLD WIMBUSH, SIMON
ALLISON, PATRICIA HULL, Individually
and On Behalf of All Others Similarly
Situated,

                                      **OPINION & ORDER**

                Plaintiffs,               No. 20-CV-3124 (CS)

    - against -

THE WORLD HEALTH ORGANIZATION,

                Defendant.
-------------------------------------------------------------x

Appearances:

Steven Bennett Blau
Shelly A. Leonard
Blau Leonard Law Group LLC
Huntington, New York
*Counsel for Plaintiffs*

Donald Francis Donovan
Catherine Amirfar
Natalie L. Reid
Elizabeth Nielsen
Matthew D. Forbes
Alyssa T. Yamamoto
Sebastian Dutz
Debevoise & Plimpton LLP
New York, New York
*Counsel for Defendant*

Seibel, J.

      Before the Court is Defendant's Motion to Dismiss all claims in Plaintiffs' Second

Amended Complaint. For the following reasons, the motion is GRANTED.

## I.    BACKGROUND

For purposes of this motion, I accept as true the facts, but not the conclusions, set forth in Plaintiffs' Second Amended Complaint. (Doc. 31 ("SAC").)

### A.    Facts

Plaintiffs commenced this action against Defendant World Health Organization (the "WHO"), alleging negligence in responding to the COVID-19 pandemic. The WHO "is a specialized agency of the United Nations responsible for international public health." (SAC ¶ 12.) It acts within the United Nations system to promote human health and well-being, monitor public health risks, and coordinate responses to health emergencies. (*Id*. ¶¶ 32, 33.) The United States is a member nation of the WHO, providing financial and technical support and participating in the WHO's governance structure. (*Id*. ¶¶ 44, 95.) The WHO maintains regional and country offices throughout the world, including one at the United Nations headquarters in Manhattan. (*See id*. ¶¶ 14, 58, 125.)

In December 2019, the first patients exhibiting symptoms of COVID-19 were hospitalized in Wuhan, China. (*See id*. ¶ 48.) According to one study, "laboratory testing was being done on patients" who exhibited these symptoms in mid-to-late December. (*Id*. ¶ 52.) As early as December 27, 2019, "a Guangzhou-based genomics company had sequenced most of the virus," and it was similar to the deadly SARS coronavirus that caused nearly 800 deaths between 2002 and 2003. (*Id*. ¶ 53.) The Wuhan Municipal Health Commission ("WMHC") released a notice about the virus to medical institutions on December 30, 2019. (*Id*. ¶ 55.)

The WHO claims it received its first notice of COVID-19's existence on December 31, 2019, when its country office in China picked up on a media statement on the WMHC website. (*Id*. ¶ 57.) The WHO China country office then notified the International Health Regulations

("IHR") focal point in the WHO Western Pacific Regional Office.  (*Id*. ¶ 58.)  On December 31, 2019, the WMHC declared that investigations had not, thus far, "found any obvious human-to-human transmission and no medical staff infection."  (*Id*. ¶ 60.)  Plaintiffs allege that this declaration from the Wuhan health authorities was contrary to "the belief of the doctors working on patients in Wuhan."  (*Id*.)

On January 2, 2020, the Wuhan Institute of Virology completed a map of the virus's genome.  (*Id*. ¶ 68.)  The next day, China's National Health Commission ("NHC") "ordered institutions not to publish any information" related to the virus and "ordered labs to transfer any samples they had to designated testing institutions, or to destroy them."  (*Id*. ¶ 69.)  Despite these orders, sources in China notified the U.S. government about the virus on January 3.  (*Id*. ¶ 70.)

The WHO "released a statement on its website" on January 5, stating that, "[b]ased on the preliminary information from the Chinese investigation team, no evidence of significant human-to-human transmission and no health care worker infections have been reported."  (*Id*. ¶ 71.)  Plaintiffs allege that the "WHO had actual or constructive notice that China was wrongfully denying or downplaying the risk of human-to-human transmission in the critical weeks while the virus was first spreading."  (*Id*. ¶ 63.)  Plaintiffs state, without elaboration, that such knowledge came from "warnings from Taiwan and Hong Kong about the risk of human-to-human transmission."  (*Id*. ¶ 64.)  On January 6, the U.S. Centers for Disease Control ("CDC") asked to study COVID-19 within China "but was barred by the Chinese Government from entering the country until mid-February," and "[the] WHO did not intervene."  (*Id*. ¶ 72.)

Authorities in China publicly confirmed that the outbreak originated from a novel coronavirus on January 9, 2020.  (*Id*. ¶ 73.)  On January 12, "Chinese authorities and the WHO shared the genetic sequence of COVID-19 with the international community."  (*Id*. ¶ 76.)  Two

days later, the WHO stated on Twitter that "[p]reliminary investigations conducted by the Chinese authorities have found no clear evidence of human-to-human transmission of the novel coronavirus (2019-nCoV) identified in Wuhan, China." (*Id*. ¶ 78.)

On January 20 and 21, 2020, a WHO delegation "conducted a field visit to Wuhan to learn about the response to 2019 novel coronavirus." (*Id*. ¶ 80.) The WHO issued a statement on January 22 that "there was evidence of human-to-human transmission in Wuhan, but more investigation was needed to understand the full extent of transmission." (*Id*. ¶ 81.) From January 22 through 23, the WHO convened an Emergency Committee to "assess whether the outbreak constituted a public health emergency of international concern," but did not reach a consensus based on the evidence available. (*Id.* ¶ 82.)

A WHO delegation traveled to Beijing on January 28 to "learn more about China's response, and to offer any technical assistance." (*Id*. ¶ 83.) The next day, WHO's Director-General addressed journalists at a press conference in Geneva, thanking "the Chinese government for the extraordinary steps it had taken to prevent the spread of the new coronavirus." (*Id*. ¶ 84.) Plaintiffs describe these statements as part of a pattern of "praise heaped on the [Chinese Communist Party]'s handling of the pandemic, reveal[ing] a disturbing willingness to ignore science and alternative credible sources." (*Id*. ¶ 65.) On January 30, the WHO declared that COVID-19 "constituted a Public Health Emergency of International Concern," but "did not recommend any travel or trade restriction." (*Id*. ¶ 85.) After the United States imposed travel restrictions on January 31, 2020, the WHO opined that widespread restrictions were not needed and could increase "fear and stigma, with little public health benefit." (*Id.* ¶ 93.)

On March 11, 2020, the WHO concluded that "COVID-19 can be characterized as a pandemic." (*Id.* ¶ 88.)

Plaintiffs allege that the WHO's response to the pandemic between December 2019 and March 2020 as described above was negligent and reckless. (*Id.* ¶ 89.) Specifically, they assert that the WHO negligently failed to (1) "timely declare [COVID-19] a public health emergency of international concern," (2) "properly monitor the response to the Coronavirus pandemic in China," (3) "timely promulgate the correct treatment guidelines to its members," (4) "timely and properly issue appropriate guidance to its members on how they should respond to the Coronavirus pandemic emergency," and (5) "act as a global coordinator." (*Id.* ¶ 1.) As a result, Plaintiffs allege that the WHO "proximately caused injury and incalculable harm to Plaintiffs and Class Members." (*Id.* ¶ 4.) Plaintiffs are residents of Westchester County, New York, and bring this action on behalf of "[a]ll adult persons in the County of Westchester, State of New York who have suffered injury, damage and loss related to the outbreak of the [*sic*] COVID-19," as well as "[a]ll adult persons in the County of Westchester, State of New York who have been diagnosed with, treated for and/or died from COVID-19." (*Id.* ¶ 103.)

### B.   **Procedural History**

Plaintiffs filed their Complaint on April 20, 2020, (Doc. 1), and their First Amended Complaint on May 4, 2020, (Doc. 7). On August 14, Defendant submitted a letter requesting a pre-motion conference concerning its anticipated motion to dismiss on grounds of immunity, (Doc. 20), and Plaintiffs submitted a letter in opposition to Defendant's request, arguing that the Court should not hear the motion until after discovery, during which Plaintiffs could gather facts necessary for their opposition. (Doc. 21).

The Court held a pre-motion conference on September 9, 2020, in which it denied Plaintiffs' request to defer adjudication of Defendant's proposed motion under Federal Rule of Civil Procedure 12(b)(1) but granted Plaintiffs the opportunity to submit another amended complaint with any additional facts which might address Defendant's immunity defense. (Minute Entry dated September 9, 2020.) On October 1, Plaintiffs filed their Second Amended Complaint. (Doc. 31.) Defendant filed its Motion to Dismiss, (Doc. 32), and Memorandum of Law, (Doc. 33), on November 2, 2020. Plaintiffs filed their Memorandum in Opposition on December 18, 2020. (Doc. 37.) Defendant filed its Reply Memorandum on January 8, 2021. (Doc. 38.)

## II. <u>LEGAL STANDARD</u>

Under Federal Rule of Civil Procedure 12(b)(1), a district court may properly dismiss an action "for lack of subject matter jurisdiction if the court 'lacks the statutory or constitutional power to adjudicate it.'" *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.A.R.L.*, 790 F.3d 411, 416-17 (2d Cir. 2015) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). "The issue of [the WHO's] immunity from suit implicates this Court's subject matter jurisdiction and is properly addressed under the standards governing a Rule 12(b)(1) motion." *Sadikoglu v. United Nations Dev. Programme*, No. 11-CV-294, 2011 WL 4953994, at *2 (S.D.N.Y. Oct. 14, 2011). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova*, 201 F.3d at 113. In determining whether subject matter jurisdiction exists, the district court "must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff, but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547

F.3d 167, 170 (2d Cir. 2008) (citation and internal quotation marks omitted), *aff'd*, 561 U.S. 247 (2010). The Court may "rely on evidence outside the complaint" when deciding a Rule 12(b)(1) motion. *Cortlandt St. Recovery Corp.*, 790 F.3d at 417.

## III. DISCUSSION

### A. Immunity Pursuant to the WHO Constitution

Defendant first argues that Plaintiffs' claims are barred by absolute immunity under the WHO constitution. That document, which came into effect in 1948, provides that the WHO "shall enjoy in the territory of each Member such privileges and immunities as may be necessary for the fulfilment of its objective and for the exercise of its functions." WHO Const., art. 67. It further provides that "privileges and immunities shall be defined in a separate agreement." *Id.* art. 68. This "separate agreement" refers to the Special Convention on the Privileges and Immunities of the Specialized Agencies of November 21, 1947. 33 U.N.T.S. 261 ("Special Convention"). The Special Convention explicitly states that "specialized agencies," including the WHO, "shall enjoy immunity from every form of legal process except in so far as in any particular case they have expressly waived their immunity." Special Convention, art. III, § 4. Defendant argues that it is immune from this suit because it has not expressly waived this immunity. (*See* Doc. 33 at 12-16.)

As a "constituent instrument of an international organization," the WHO's constitution is an international treaty. Vienna Convention on the Law of Treaties, arts. 2(1)(a), 5, *opened for signature* May 23, 1969, 1155 U.N.T.S. 331. "But not all international law obligations automatically constitute binding federal law enforceable in United States courts." *Medellín v. Tex.*, 552 U.S. 491, 504 (2008). The Supreme Court "has long recognized the distinction" between self-executing and non-self-executing treaties. *Id*. The former "'operates of itself

7

without the aid of any legislative provision.'" *Id.* at 505 (quoting *Foster v. Neilson*, 27 U.S. 253, 314 (1829)).  The latter "'can only be enforced pursuant to legislation to carry them into effect.'" *Id.* (quoting *Whitney v. Robertson*, 124 U.S. 190, 194 (1888)).  Essentially, "while treaties may comprise international commitments, they are not domestic law unless Congress has either enacted implementing statutes or the treaty itself conveys an intention that it be 'self-executing' and is ratified on these terms."  *Id.* at 505 (cleaned up).

Congress passed a Joint Resolution in 1948 "accept[ing] membership for the United States in [the WHO], the constitution of which was adopted in New York on July 22, 1946." 22 U.S.C. § 290.  This 1948 Joint Resolution constituted an *ex post* congressional-executive agreement.  *See* Restatement (Third) of Foreign Relations Law, § 303, cmt. e (1987).[1] Generally, such congressional-executive agreements can be "presumed self-executing unless specified otherwise."  Oona A. Hathaway, *Treaties' End: The Past, Present, and Future of International Lawmaking in the United States*, 117 Yale L.J. 1236, 1321 (2008); *see New York Chinese TV Programs, Inc. v. U.E. Enters., Inc.*, No. 88-CV-4170, 1989 WL 22442, at *12 (S.D.N.Y. Mar. 8, 1989) (noting that congressional-executive agreements are "as binding in United States law as treaties") (collecting cases).

---

[1] Comment E reads as follows:

Congress may enact legislation that requires, or fairly implies, the need for an agreement to execute the legislation.  Congress may authorize the President to negotiate and conclude an agreement, or to bring into force an agreement already negotiated, and may require the President to enter reservations.  *See*, *e.g.*, § 468, Reporters' Note 6.  Congress may also approve an agreement already concluded by the President. Congress cannot itself conclude such an agreement; it can be concluded only by the President, who alone possesses the constitutional power to negotiate with other governments.

While Plaintiffs do not directly contest that the Joint Resolution conferred treaty immunity on the WHO,[2] Defendant notes, candidly, that at least one other court has cast doubt on whether the WHO constitution is self-executing and binding U.S. law. (*See* Doc. 38 at 4 n.1 (citing *Rodriguez v. Pan Am. Health Org.*, No. 20-CV-928, 2020 WL 6561448, at *18 (D.D.C. Nov. 9, 2020).) While Defendant argues that the reasoning in *Rodriguez* is flawed, and presents several arguments as to why the WHO constitution is in fact self-executing and conveys absolute immunity on the Defendant, it is not necessary for me to weigh in on this issue. Regardless of whether the WHO constitution is a self-executing treaty, the WHO is independently immune from suit under the International Organization Immunities Act ("IOIA").

**B.    Immunity Pursuant to the IOIA**

Immunity under the IOIA is concurrent with and separate from any treaty-based immunity the WHO may have. *See* Exec. Order No. 10,025, 13 Fed. Reg. 9361 (Dec. 31, 1948); *see also Polak v. Int'l Monetary Fund*, 657 F. Supp. 2d 116, 120 (D.D.C. 2009) ("The IOIA serves as a separate and independent source of immunity for international organizations such as the defendant."), *aff'd*, No. 09-7114, 2010 WL 4340534 (D.C. Cir. Oct. 20, 2010). The IOIA grants international organizations "the same immunity from suit and every form of judicial

---

[2] Plaintiffs instead argue in their Memorandum in Opposition that there is no constitutional immunity because President Trump withdrew the United States from the WHO by terminating the 1948 congressional-executive agreement, and that the issues thereby raised present non-justiciable political questions. (Doc. 37 at 5-6.) President Trump's action occurred on July 7, 2020, after the events underlying Plaintiffs' complaint, and was not to be effective until July 6, 2021, *see* Cong. Research Serv., R46575, *U.S. Withdrawal from the World Health Organization: Process and Implications* 1 (2020), so the Court is dubious that the withdrawal would affect the immunity analysis. In any event, President Biden confirmed on the day of his inauguration, via a letter to the U.N. Secretary General, that the United States has not withdrawn and will not withdraw from the WHO. (Doc. 39-1.) Accordingly, this Court need not address Plaintiffs' argument that the implications of the termination of the agreement present a non-justiciable political question.

9

process as is enjoyed by foreign governments, except to the extent that such organizations may expressly waive their immunity for the purpose of any proceedings or by terms of any contract." 22 U.S.C. § 288a(b).  "Today, that means that the Foreign Sovereign Immunities Act [("FSIA")] governs the immunity of international organizations."  *Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 772 (2019).

The defendant must first "present[] a prima facie case that it is a foreign sovereign." *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993) (citing *Baglab Ltd. v. Johnson Matthey Bankers Ltd.*, 665 F. Supp. 289, 293-94 (S.D.N.Y. 1987)).  The plaintiff then "has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted."  *Id.* (citing *Baglab Ltd.*, 665 F. Supp. at 293-94).  The ultimate burden of persuasion, however, "remains with the alleged foreign sovereign."  *Id.* (citing *Forsythe v. Saudi Arabian Airlines Corp.*, 885 F.2d 285, 289 n.6 (5th Cir. 1989)).  To determine jurisdiction under the FSIA, "the district court must look at the substance of the allegations."  *Id.* at 1019.

The WHO was designated as a "public international organization[] entitled to enjoy the privileges, exemptions, and immunities conferred by the [IOIA]" by President Truman via executive order in 1948.  *See* Exec. Order 10,025, *supra*.  Plaintiffs do not dispute that the FSIA applies to the WHO but argue instead that an exception to FSIA's immunity applies.  (*See* Doc. 37 at 10.)

### 1. The Non-Commercial Tort Exception

First, under 28 U.S.C. § 1605(a)(5), known colloquially as FSIA's "non-commercial tort exception," immunity does not apply in any case "in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the

United States and caused by the tortious act or omission of that foreign state." 28 U.S.C. § 1605(a)(5).  "Courts read this exception narrowly," *Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410, 427 (S.D.N.Y. 2019), and the exception applies only when the "entire tort" occurs "within the territorial jurisdiction of the United States."  *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 109, 116 (2d Cir. 2013) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 441 (1989)).  Further, the exception does not apply to any claims predicated on the exercise or failure to exercise a discretionary function, regardless of whether that discretion was abused.  *See Democratic Nat'l Comm.*, 392 F. Supp. 3d at 427.

        a.        <u>The "Entire Tort" Rule</u>

The "entire tort" rule means that to be within the non-commercial tort exception, "not only the injury but also the act precipitating that injury" must occur within the territorial jurisdiction of the United States.  *Jerez v. Republic of Cuba*, 775 F.3d 419, 424 (D.C. Cir. 2014) (citing *Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517, 1525 (D.C. Cir 1984)); *accord In re Terrorist Attacks*, 714 F.3d at 116.

Plaintiffs contend in the SAC that the WHO's "negligent commissions and omissions . . . have proximately caused injury and incalculable harm to Plaintiffs and Class Members," (SAC ¶ 4), but they do not allege that any of the relevant WHO conduct occurred in the United States.[3]

---

[3] In Plaintiffs' Memorandum in Opposition, Plaintiffs state that the Pan American Health Organization ("PAHO") in Washington, D.C. "engaged in evidence-based decision-making in connection with COVID-19" and that the "gravamen of plaintiffs' claims is, in part, that the WHO negligently failed to follow and comply" with WHO Outbreak Communications Guidelines that are posted on the PAHO website. (Doc. 37 at 13-14.)  Although these allegations do not appear in the SAC, I am permitted to consider evidence outside the complaint on a motion under Rule 12(b)(1).  But the only evidence to which Plaintiffs point does not support their contentions.  As for "decision-making in connection with COVID-19," they specify nothing regarding the pandemic and cite only the general statement on the PAHO website that "[f]rom its Washington, D.C., headquarters, 27 country offices and three specialized centers in the region,

11

Instead, Plaintiffs point to actions taken by the WHO in China, the WHO Western Pacific Regional Office in the Philippines,[4] and the WHO world headquarters in Geneva, Switzerland. (*Id.* ¶¶ 57, 58, 81, 83, 84.)  Plaintiffs also refer to actions taken by the WHO in unspecified countries, stating that the WHO negligently disseminated information online, (*see id.* ¶¶ 61, 71, 78), "ignored warnings from Taiwan and Hong Kong," (*id.* ¶ 64), and "did not intervene" after the Chinese Government barred the CDC from studying COVID-19 within China, (*id.* ¶ 72). There is no information provided, however, to indicate that WHO personnel in the United States were responsible for these actions or inactions.

In their Opposition to Defendant's Motion to Dismiss, Plaintiffs argue that the WHO's online COVID-19 information "emanated from and was facilitated by the digital based media on the internet in the United States." (Doc. 37 at 15.)  To support the claim that such information "emanated from" the United States, Plaintiffs argue that the "internet information campaign could not have originated in China" because that country blocks social media. (*Id.*)  This alone, however, does not plausibly show that the information originated from the United States, given that the WHO has offices in countries other than the United States and China.[5]  Plaintiffs allege

---

PAHO promotes evidence-based decision-making to improve and promote health as a driver of sustainable development." (*Id.* at 13.)  And that WHO guidelines applicable worldwide appear on that website hardly supports the conclusion that the challenged decisions were made in the United States.  These website statements are far too vague and general to constitute even an allegation, let alone evidence, of conduct in the United States injurious to Plaintiffs.

[4] The website of the Western Pacific Regional Office states that it is based in the Philippines. *See* World Health Org., Western Pacific, *About WHO in the Western Pacific*, https://www.who.int/westernpacific/about (last visited Apr. 1, 2021) ("[W]e are located in the Philippines, where we have been since 1951.")

[5] This allegation is also puzzling, as one of Plaintiffs' main accusations is that the WHO unquestioningly accepted false information provided by China, (*see, e.g.*, SAC ¶¶ 63-64, 78, 84, 96, 134, 140-45), so it is not clear why it could not have done so from China.

12

no facts from which this Court could reasonably infer that the WHO disseminated these statements from within the United States, as opposed to, say, its headquarters in Geneva, Switzerland or any other country besides China.

Plaintiffs also argue that the negligent conduct occurred in the United States because the WHO's dissemination of information was "facilitated by digital based media on the internet in the United States." (*Id*.) Plaintiffs argue that the "WHO heavily utilized Twitter and other American microblogging and social networking services . . . to publish and communicate [COVID-19] notices, guidance, warnings and medical advice top [*sic*] plaintiffs and putative Class members." (*Id*.) That a statement may have been disseminated using the internet or a platform created by an American company does not suffice to show that the entire tort occurred in the United States. The internet is everywhere, and courts have consistently held that an entire tort is not committed in the United States simply because it involved use of technology accessible in the United States. *See Doe v. Fed. Democratic Republic of Eth.*, 851 F.3d 7, 11 (D.C. Cir. March 14, 2017) (entire tort was not committed in United States when plaintiff opened in United States a computer virus emailed from Ethiopia); *Democratic Nat'l Comm.*, 392 F. Supp. 3d at 427-28 (entire tort was not committed in United States when computers in United States were hacked by person in Russia); *Park v. Korean Broad. Sys.*, No. 07-CV-2233, 2008 WL 4724374, at *3 (C.D. Ill. Oct. 24, 2008) (entire tort not committed in United States when South Korean company prepared and broadcast inadequate information to U.S. viewers through internet); *cf. HB Prods., Inc. v. Faizan*, No. 19-CV-487, 2020 WL 6784347, at *6 (D. Haw. Nov. 18, 2020) ("Defendant's use of United States companies with global reach" insufficient for personal jurisdiction). Thus, in the absence of facts plausibly showing that the statements were published by the WHO from within the United States, the WHO's use of the internet and media

13

platforms based in the United States cannot constitute an "entire tort" committed by the organization in the United States.[6]

### b. The "Discretionary Acts" Exception

Even if Plaintiffs could satisfy the entire tort rule, the WHO nevertheless retains its immunity if "the acts alleged to be negligent [are] discretionary, in that they involve an element of judgment or choice and are not compelled by statute or regulation," and "the judgment or choice in question [is] grounded in considerations of public policy or susceptible to policy analysis." *USAA Cas. Ins. Co. v. Permanent Mission of Republic of Namib.*, 681 F.3d 103, 111-12 (2d Cir. 2012).

Plaintiffs state in their complaint that "[t]he discretionary function exception does not apply . . . because [the] WHO negligently failed to perform its clear duty or to act in accord with specific mandatory directives contained in the [IHR]." (SAC ¶ 28.) Even if the IHR creates mandatory directives for the WHO, however, these regulations do not support Plaintiffs' contention. While Plaintiffs cite to Articles 6 through 8 of the IHR in their Memorandum in Opposition, (Doc. 37 at 25), the only relevant provisions in these articles specify obligations of State Parties, not the WHO. *See* Int'l Health Regulations (3d ed. 2005) ("IHR 2005"), arts. 6-8. Articles 7 and 8 do not specify any obligation of the WHO, and the only directive given to the

---

[6] Further, even if it could be said that the WHO's dissemination of information occurred in the United States, that dissemination is not the "entire tort." Rather, to the extent Plaintiffs specify a location for the failings between December 2019 and March 2020 that they challenge, they occurred mostly in China. At best Plaintiffs allege "a transnational tort over which [the Court] lack[s] subject matter jurisdiction." *Doe*, 851 F.3d at 11.

14

WHO under Article 6 is to "immediately notify the [International Atomic Energy Agency]" if notification received by WHO involves this agency. *Id.*[7]

Plaintiffs also allege that the "WHO had the duty to request, in accordance with Article 9 [of the IHR], verification from China, of sources" of COVID-19 information. (SAC ¶ 140.)[8] But the SAC does not allege that the WHO failed to make such a request, but instead makes only the general and vague assertion that the "WHO negligently failed to provide effective leadership and implementation of its core global functions under IHR." (*Id.*) And in any event, this function does not pertain to the WHO's dissemination of information in the United States. IHR 2005 art. 9. Article 10 of the IHR, a portion of which *does* pertain to the WHO's dissemination of information in the United States, makes plain that this function is discretionary, stating that if the relevant country declines to collaborate with the WHO, the "WHO *may*, *when justified by the magnitude of the public health risk*, share with other States Parties the information available to it." *Id.* art. 10 (emphasis added). A judgment grounded in assessment of public health risk is a consideration of public policy. *USAA Cas Ins. Co.*, 681 F.3d at 111-12; *see Mahon v. United States*, 742 F.3d 11, 15-16 (1st Cir. 2014) (decision involving choice as to how to manage risk is product of discretion, and determining what precautions to take based on competing values is "the stuff of policy analysis," so discretionary function exception applied).

---

[7] Plaintiffs allege that the "WHO was negligent and recklessly failed to enforce these IHR core capacity requirements against China," (SAC ¶ 134), but they do not identify any enforcement mechanism in the IHR or elsewhere, or otherwise suggest how the WHO might have done so.

[8] Article 9 provides that when the WHO takes into account reports from sources other than notifications and consultations from or with member countries, it shall – after assessing them "according to established epidemiological principles" and "communicat[ing] information on the event to the State Party in whose territory the event is allegedly occurring" – "consult with and attempt to obtain verification from the State Party in whose territory the event is allegedly occurring in accordance with the procedure set forth in Article 10." IHR 2005 art. 9.

Finally, Plaintiffs allege that the IHR "outline the criteria to determine whether or not a particular event constitutes a 'public health emergency of international concern,'" (SAC ¶ 130 (referring to IHR 2005 art. 12)), and allege that the WHO waited too long to make such a declaration regarding COVID-19, (*id.* ¶¶ 1, 89, 92, 144). The factors set forth in Article 12 include, among other things, committee advice, available scientific evidence and an "assessment of the risk to human health, of the risk of international spread of the disease and of the risk of interference with international traffic." IHR 2005 art. 12. These criteria, far from presenting a situation where "there is no room for choice," *United States v. Gaubert*, 499 U.S. 315, 324 (1991), present a quintessential judgment call that may not be second-guessed in court through hindsight, *see Chen v. United States*, No. 09-CV-2306, 2011 WL 2039433, at *10 (E.D.N.Y. May 24, 2011), *aff'd sub nom. Qin Chen v. United States*, 494 F. App'x 108 (2d Cir. 2012) (summary order); *see also Lockett v. United States,* 938 F.2d 630, 639 (6th Cir. 1991) (finding EPA's response to PCB spill within discretionary function exception, because "these discretionary decisions, based upon 'judgment calls' concerning the sufficiency of evidence of violations of applicable regulations, the allocation of limited agency resources, and determinations about priorities of serious threat to public health, are the very 'public policy' discretionary judgments Congress intended to shield from liability . . . .").[9]

As Plaintiffs recognize, (Doc. 37 at 20-21), "[w]here there is room for policy judgment and decision there is discretion," *Dalehite v. United States*, 346 U.S. 15, 36 (1953). The WHO's decisions regarding its handling of COVID-19 involved policy judgments. Thus, even if the

---

[9] *Chen* and *Lockett* arose under the Federal Tort Claims Act ("FTCA"), but the discretionary function exception of that statute and of the FSIA are construed consistently. *USAA Cas. Ins. Co.*, 681 F.3d at 112 n.43.

16

entire tort rule did not bar Plaintiffs' claim, the WHO would still retain its immunity under the discretionary acts exception to the non-commercial tort exception.

### 2. Waiver of Immunity

In an argument Plaintiffs have abandoned in their brief, they alleged in the SAC that even if the WHO is immune, it "impliedly waived its immunity under FSIA by violating the jus cogens norms of international law condemning human rights health violations in connection with global communicable disease surveillance and governance." (SAC ¶ 23.)[10] The Second Circuit, however, has explicitly rejected "the claim that a jus cogens violation constitutes an implied waiver within the meaning of the FSIA." *Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239, 245 (2d Cir. 1996). While the WHO may expressly waive its immunity under the IOIA, 28 U.S.C. § 1605(a)(1), there is nothing in the record that plausibly suggests it has done so. Thus, the WHO is immune from the present suit under the IOIA, and the complaint must be dismissed.

### C. Leave to Amend

Finally, I consider whether Plaintiff should be granted leave to amend, which should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). "[I]t is within the sound

---

[10] "A *jus cogens* norm, also known as a peremptory norm of international law, is a norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character." *Carpenter v. Republic of Chile*, 610 F.3d 776, 779 n.4 (2d Cir. 2010) (internal quotation marks omitted). "*Jus cogens* embraces customary laws considered binding on all nations, and is derived from values taken to be fundamental by the international community, rather than from the fortuitous or self-interested choices of nations." *Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 61 (2d Cir. 2019) (internal quotation marks omitted).

discretion of the district court to grant or deny leave to amend." *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018) (internal quotation marks omitted). "Leave to amend, though liberally granted, may properly be denied for: 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.'" *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Plaintiffs have already amended their complaint twice, once after having the benefit of a pre-motion letter from Defendant outlining the proposed grounds for dismissal, (Doc. 20), and the discussion at the September 9, 2020 pre-motion conference. In general, a plaintiff's failure to fix deficiencies in the previous pleading, after being provided notice of them, is alone sufficient ground to deny leave to amend. *See Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257-58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first. Simply put, a busy district court need not allow itself to be imposed upon by the presentation of theories *seriatim*.") (cleaned up); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (denying leave to amend because "the plaintiffs have had two opportunities to cure the defects in their complaints, including a procedure through which the plaintiffs were provided notice of defects in the Consolidated Amended Complaint by the defendants and given a chance to amend their Consolidated Amended Complaint," and "plaintiffs have not submitted a proposed amended complaint that would cure these pleading defects"), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) (*per curiam*) ("[P]laintiffs were not

entitled to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies.") (internal quotation marks omitted).

Second, dismissal with prejudice is appropriate when "the flaws in pleading are incurable." *Fort Worth Employers' Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 233 (S.D.N.Y. 2009); *see Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (affirming dismissal of *pro se* complaint without leave to replead because "[t]he problem with [Plaintiff's] causes of action is substantive; better pleading will not cure it"). Courts regularly dismiss complaints with prejudice where the defendant is immune from suit. *See, e.g.*, *MMA Consultants 1, Inc. v. Republic of Peru*, 245 F. Supp. 3d 486, 520 (S.D.N.Y. 2017) (dismissing complaint with prejudice due to FSIA immunity); *Schermerhorn v. Israel*, 235 F. Supp. 3d 249, 262 (D.D.C. 2017) (same); *Kettey v. Saudi Ministry of Educ.*, 53 F. Supp. 3d 40, 49 (D.D.C. 2014) (same).

Further, Plaintiffs have not requested leave to amend or otherwise suggested that they are in a position to cure the deficiencies identified in this decision. *See TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (plaintiff need not be given leave to amend if plaintiff fails to specify how amendment would cure pleading deficiencies in complaint); *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (district court did not err in dismissing claim with prejudice in absence of any indication plaintiff could or would provide additional allegations leading to different result); *Horoshko v. Citibank, N.A.*, 373 F.3d 248, 249-50 (2d Cir. 2004) (*per curiam*) (district court did not abuse discretion by not granting leave to amend where no indication as to what might have been added to make complaint viable and plaintiffs did not request leave to amend). Accordingly, I decline to grant leave to amend *sua sponte*.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss is GRANTED and Plaintiffs' Second Amended Complaint is dismissed with prejudice.  The Clerk of Court is respectfully directed to terminate the pending motion, (Doc. 32), and close the case.

**SO ORDERED.**

Dated: April 5, 2021
      White Plains, New York

                                            CATHY SEIBEL, U.S.D.J.